# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**Larry B.,**
**Petitioner Below, Petitioner**

**FILED**

**September 5, 2017**

RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**vs) No. 16-0720** (Mercer County 15-C-370-DS)

**David Ballard, Warden,**
**Mount Olive Correctional Complex,**
**Respondent Below, Respondent**


## MEMORANDUM DECISION

Petitioner Larry B., by counsel Paul Cassell, appeals the Circuit Court of Mercer County's June 22, 2016, order denying his petition for writ of habeas corpus.[1] Respondent David Ballard, Warden, by counsel Julie A. Warren, filed a response. On appeal, petitioner argues that the circuit court erred in denying his habeas petition on the grounds of ineffective assistance of trial counsel and that his guilty plea was not knowingly, intelligently, and voluntarily made.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

During the October of 2003 term of court, a grand jury indicted petitioner on fourteen counts of first-degree sexual assault, eight counts of incest, and sixteen counts of sexual abuse by a custodian. According to the indictment, petitioner was alleged to have engaged in sexual misconduct with three minor children in his care.

In March of 2004, petitioner pled guilty, pursuant to a plea agreement, to three counts of first-degree sexual assault, three counts of incest, and two counts of sexual abuse by a custodian. In exchange, the State agreed to dismiss the remaining counts from the indictment. Thereafter, the circuit court held a sentencing hearing and imposed the following sentence: not less than fifteen nor more than thirty-five years for the offense of first-degree sexual assault as set forth in

---

[1]Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W.Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R. II*, 230 W.Va. 731, 742 S.E.2d 419 (2013); *State v. Brandon B.*, 218 W.Va. 324, 624 S.E.2d 761 (2005); *State v. Edward Charles L.*, 183 W.Va. 641, 398 S.E.2d 123 (1990).

counts one, nine, and thirty-five of the indictment; not less than five nor more than fifteen years for the offense of incest as set forth in counts eleven, seventeen, and thirty-six of the indictment; and not less than ten nor more than twenty years for the offense of sexual abuse by a custodian as set forth in counts twenty-one and thirty-three of the indictment. The sentences were ordered to run consecutively to one another. Additionally, the circuit court suspended the sentences imposed for counts nine, seventeen, twenty-one, thirty-three, thirty-five, and thirty-six and ordered that petitioner be placed on probation for five years following the completion of his term of incarceration. Petitioner did not appeal this order.

In May of 2013, petitioner filed a pro se petition for writ of habeas corpus and a motion to be resentenced for purposes of appeal. After the circuit court appointed him counsel, petitioner filed a renewed motion to be resentenced for purposes of appeal. The circuit court thereafter entered two orders resentencing petitioner, although he eventually decided not to pursue a direct criminal appeal in light of his pending habeas action in circuit court.

In November of 2015, petitioner, by counsel, filed his petition for writ of habeas corpus. The petition raised the following grounds: ineffective assistance of counsel, involuntary guilty plea, disproportionate sentence, and deficient indictment. After respondent filed a brief, the circuit court held an omnibus evidentiary hearing in February of 2016. Following the hearing, the circuit court entered an order in June of 2016 denying the petition for writ of habeas corpus. It is from this order that petitioner appeals.

This Court reviews appeals of circuit court orders denying habeas corpus relief under the following standard:

> "In reviewing challenges to the findings and conclusions of the circuit court in a habeas corpus action, we apply a three-prong standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard; the underlying factual findings under a clearly erroneous standard; and questions of law are subject to a *de novo* review." Syllabus point 1, *Mathena v. Haines*, 219 W.Va. 417, 633 S.E.2d 771 (2006).

Syl. Pt. 1, *State ex rel. Franklin v. McBride*, 226 W.Va. 375, 701 S.E.2d 97 (2009).

On appeal to this Court, petitioner argues that he was entitled to habeas relief due to trial counsel's ineffective representation and his allegation that his guilty plea was not knowingly, intelligently, and voluntarily made. The Court, however, does not agree. Upon our review and consideration of the circuit court's order, the parties' arguments, and the record submitted on appeal, we find no error or abuse of discretion by the circuit court. Our review of the record supports the circuit court's decision to deny petitioner post-conviction habeas corpus relief based on these alleged errors, which were also argued below. Indeed, the circuit court's order includes well-reasoned findings and conclusions as to the assignments of error raised on appeal. Given our conclusion that the circuit court's order and the record before us reflect no clear error or abuse of discretion, we hereby adopt and incorporate the circuit court's findings and conclusions as they relate to petitioner's assignments of error raised herein and direct the Clerk to attach a copy of the circuit court's June 22, 2016, "Order Denying The Petitioner's Petition For Writ of

Habeas Corpus Ad Subjiciendum And Removing This Action From the Active Docket Of This Court" to this memorandum decision.

For the foregoing reasons, we affirm.

Affirmed.

**ISSUED:** September 5, 2017

**CONCURRED IN BY:**

Chief Justice Allen H. Loughry II
Justice Robin Jean Davis
Justice Margaret L. Workman
Justice Menis E. Ketchum
Justice Elizabeth D. Walker

COPY 16-0720

IN THE CIRCUIT COURT OF MERCER COUNTY, WEST VIRGINIA

STATE OF WEST VIRGINIA EX REL.,
LARRY B                          ,

Petitioner,

V.                          Civil Action No. 15-C-370-DS

DAVID BALLARD, WARDEN,
MOUNT OLIVE CORRECTIONAL COMPLEX,

Respondent.

## ORDER DENYING THE PETITIONER'S PETITION FOR WRIT OF HABEAS CORPUS AD SUBJICIENDUM AND REMOVING THIS ACTION FROM THE ACTIVE DOCKET OF THIS COURT

On February 2, 2016, this matter came before the Court, the Honorable Judge Derek C. Swope presiding, for a hearing on the Petitioner's Petition for Post-Conviction Habeas Corpus Relief, brought pursuant to the provisions of Chapter 53, Article 4A, of the West Virginia Code, as amended, which was filed by the Petitioner through his court-appointed counsel, Paul R. Cassell, Esq. The Petitioner and his counsel appeared. John McGinnis, IV, Esq., Assistant Prosecuting Attorney for Mercer County, appeared on behalf of the State of West Virginia.

The Petitioner is seeking post-conviction habeas corpus relief from his May 21, 2004 sentence of not less than fifteen (15) years nor more than thirty-five (35) years each as provided by law for the offense of Sexual Assault – First Degree for three counts of such offense; no less than five (5) years nor more than fifteen (15) years each as provided by law for the offense of Incest for three counts of such offense; and not less than ten (10) years nor more than twenty (20) years each as provided by law for the offense of Sexual Abuse by a Custodian for two counts of such offense. The Court ordered that these sentences all run consecutively, but suspended the bulk of such sentences, providing that the Petitioner be placed on probation after he served fifteen (15) to thirty-five (35) years

1

for one count of Sexual Assault – First Degree and ten (10) to twenty (20) years for one count of Sexual Abuse by a Custodian, absent a showing that he is being unlawfully detained due to prejudicial constitutional errors in the underlying criminal proceeding.

Whereupon, the Court, having reviewed and considered the Petition, the State's Response thereto, the Court files, the transcripts, the arguments of counsel, and the pertinent legal authorities, does hereby deny the Petitioner's Petition for Habeas Corpus Relief.

In support of the aforementioned ruling, the Court makes the following General Findings of Fact and Conclusions of Law:

## I. FACTUAL/PROCEDURAL HISTORY OF MERCER COUNTY CRIMINAL CASE NUMBER 03-F-244

### A. The Indictment

By a True Bill returned in the October 2003 term by the Mercer County Grand Jury, the Petitioner, Larry B            , was indicted in a thirty-eight count indictment for fourteen (14) counts of Sexual Assault – First Degree, eight (8) counts of Incest, and sixteen (16) counts of Sexual Abuse by a Custodian. It was alleged that Larry B engaged in sexual misconduct with three minor children under his care. Out of the thirty-eight count indictment, Counts 1, 3, 5, 9, 12, 15, 18, 20, 22, 26, 29, 32, 35, and 37 were for Sexual Assault – First Degree, Counts 2, 4, 6, 7, 8, 10, 13, 16, 19, 21, 23, 24, 25, 27, 30, and 33 were for Sexual Abuse by a Custodian, and Counts 11, 14, 17, 28, 31, 34, 36 and 38 were for Incest. All counts in the Indictment arise from events which allegedly occurred over a long span of time: between March 18, 1990 and March 18, 1991; during the Fall and Winter months of 2002; and during the Spring months of 2003.

2

## B. Pre-Trial Proceedings

On July 9, 2003, the Petitioner was arrested for allegedly sexually abusing his step daughter, K.B.[1] The Petitioner was placed on a $40,000 10% cash and surety bond. On July 15, 2003, the Petitioner had a preliminary hearing in Mercer County Magistrate Court, however, it was continued to July 22, 2003 upon the Petitioner's waiver of the ten (10) day time limit for same.[2] Upon the return of the above-referenced indictment, the Circuit Clerk of Mercer County sent a written Notice to the Petitioner to appear for arraignment on October 20, 2003, for which the Petitioner appeared with his appointed counsel, Ward Morgan, Esq. On October 30, 2003, the Petitioner, by his counsel, Mr. Morgan, filed a standard Motion for Discovery and Inspection pursuant to Rule 16 of the West Virginia Rules of Criminal Procedure. On November 12, 2003, the Petitioner filed a Motion to Suppress Confession; the Petitioner also filed a Motion to Sever the offenses contained in the Indictment. By Order entered on December 10, 2003, the Court deferred hearing the Petitioner's Motions pending his competency evaluation. A defense motion to continue the trial in the matter was granted on January 12, 2004.

By Order entered on March 4, 2004, the Court found that the Petitioner was competent to stand trial and/or enter a plea based on the competency evaluation report.[3]

## C. The Plea Agreement

At a plea hearing held on March 8, 2004, the Petitioner pled guilty to Counts 1, 9, and 35 of the Indictment, charging " Sexual Assault – First Degree"; to Counts 11, 17,

---

[1] Due to the sensitive nature of the offenses herein, the Court abides by the common practice to use initials for the minor victims. See, *In re K.H.*, 235 W. Va. 254 (2015); *In re Jeffrey R. L.*, 190 W. Va. 24 (1993); *State v. Edward Charles L.*, 183 W. Va. 641 (1990).

[2] The waiver did not include the Petitioner's attorney's signature, therefore it is presumed that the Petitioner's appointed counsel did not appear for the July 15 preliminary hearing, but did appear on the Petitioner's behalf on the July 22 preliminary hearing.

[3] No further hearings were held concerning the Petitioner's pre-trial Motions, and no rulings were made on the same.

3

and 36, charging "Incest"; and to Counts 21 and 33, charging "Sexual Abuse by a Custodian." In exchange for his plea, the State agreed to dismiss the remaining counts of the Indictment. The Court tentatively accepted the Petitioner's guilty plea, pending receipt of the pre-sentence investigation report. The Petitioner and the State acknowledged that there was no agreement with regard to sentencing.

## D. Sentencing

Having previously adjudged the Petitioner guilty of the aforementioned offenses during the plea hearing, on May 17, 2004, the Court sentenced the Petitioner as follows: Not less than fifteen (15) years nor more than thirty-five (35) years as provided by law for the offense of "Sexual Assault – First Degree" for Counts 1, 9, and 35; not less than five (5) nor more than fifteen (15) years as provided by law for the offense of "Incest" for Counts 11, 17, and 36; and not less than ten (10) nor more than twenty (20) years as provided by law for the offense of "Sexual Abuse by a Custodian" for Counts 21 and 33.[4] These sentences were ordered to run consecutively with one another and the Petitioner received jail credit for 284 days. The Court further ordered that the sentences imposed for Counts 9, 35, 17, 36, 21, and 33 be suspended and that the Petitioner be placed on probation for five years after completion of the indeterminate sentences of 15 – 35 years that were imposed for Count 1, and 10 – 20 years that were imposed for Count 21.

---

[4] The Court entered an Amended Order on May 21, 2004 to correct the sentences imposed for the offenses "Incest" and "Sexual Abuse by a Custodian" due to typographic errors in the prior sentencing order. Nevertheless, the Petitioner pled guilty to: Sexual Assault – First Degree in reference to minor children, K.B., the Petitioner's step-daughter; L.B.J., the Petitioner's son; and W.J.B., the Petitioner's nephew. Additionally, the Petitioner pled guilty to: Incest in reference to minor children, L.B.J. (two counts); and W.J.B. (one count). Finally, the Petitioner pled guilty to Sexual Abuse by a Custodian in reference to minor children K.B. and L.B.J., one count per child victim.

4

### E. Post-Sentencing Matters

On May 6, 2013, the Court received the Petitioner's handwritten correspondence requesting his file and appointment of counsel in order to prosecute a writ of habeas corpus, as well as a request to be resentenced in order to preserve his appeal rights. On July 11, 2013, the Court appointed Paul R. Cassell, Esq. to represent the Petitioner to pursue these causes. On September 23, 2013, the Petitioner, by counsel, filed his Motion to Resentence; on January 22, 2014, the Court resentenced the Petitioner to the same sentences as imposed earlier for appeal purposes.[5] Ultimately, due to the Petitioner's impending habeas action wherein certain challenges would be made, an appeal in the underlying criminal matter was not pursued by the Petitioner and his counsel.[6]

## II. THE PETITION FOR WRIT OF HABEAS CORPUS; THE *LOSH* CHECKLIST; THE RESPONSE OF STATE TO PETITION FOR WRIT OF HABEAS CORPUS; AND THE OMNIBUS HEARING

### A. The Petition: Civil Action No. 15-C-370

On November 2, 2015, the Petitioner, by counsel, filed his Petition for Writ of Habeas Corpus in the Circuit Court of Mercer County. The Petition raised the following grounds:

1. Ineffective assistance of counsel:

    a. Counsel was ineffective with regard to allowing the Petitioner to enter a guilty plea to the charges due to the Petitioner's alcoholism, mental health issues, as well as his mental comprehension deficits;

---

[5] On February 26, 2014, the Court again resentenced the Petitioner for appeal purposes.

[6] This decision caused the Petitioner to file his *pro se* Motion for Appointment of New Counsel on May 2, 2014, however, during the hearing on this Motion, held on May 29, 2014, the Petitioner announced to the Court that he had reconsidered this Motion and decided that he was satisfied with his current counsel, Mr. Cassell.

5

b. Counsel was ineffective due to recommending that the Petitioner accept the unfavorable "best interest" plea, wherein the Petitioner was subjected to a potential sentence of eighty (80) to one hundred and ninety (190) years, which resulted in the given sentence of not less than twenty-five (25) nor more than fifty-five (55) years, despite the Petitioner's age of 43 years old at the time, where he would first be eligible for parole at age 68 – Petitioner was essentially given a life sentence as a "best interest"; and

c. Counsel was ineffective for not fully exploring the Petitioner's mental health state because he had been suffering from a well-documented mental defect long before the plea hearing.

2. Involuntary Guilty Plea

a. The guilty plea was involuntary and due to the Petitioner's mental illness, alcoholism and poor intellectual functioning, he was unable to make a knowing, intelligent entry of a guilty plea; and

b. The Petitioner was also illiterate and could not understand the full ramifications of the guilty plea.

3. Disproportionate Sentence

a. The Petitioner's age at the time of the plea agreement, and the subsequent sentencing, effectively gave the Petitioner to a life sentence for these offenses;

6

b. The sentence shocks the conscience because even defendants convicted of murder in Mercer County have received less prison time than the Petitioner did for these alleged offenses; and

c. The Petitioner's lack of a prior felony conviction, coupled with his history of alcoholism and mental issues, underscore the disproportionate nature of the sentences imposed.

4. Deficient Indictment

a. The Indictment against the Petitioner was constitutionally inadequate to identify the conduct charged with sufficient specificity to allow the Petitioner to challenge future potential charges on double jeopardy grounds.

b. There was insufficient evidence in the record during the plea hearing to prevent future prosecution insofar as the limited number of counts provided insufficient details to differentiate among the various actions – the factual basis for the plea agreement was too vague.

In short, the Petitioner requested habeas relief for all these grounds, and for those asserted in the *Losh* Checklist. The Petitioner contends that he has maintained his innocence with regard to victims, K.B. and L.B.J., and though he acknowledged some limited conduct with W.J.B., it did not rise to the seriousness of the offenses to which he pled.

**B. THE *LOSH* CHECKLIST**

Counsel also filed the *Losh* Checklist contemporaneously with the Petition:

## **Waived Grounds:**

In his *Losh* Checklist, the Petitioner waived the following grounds for relief:

- Lack of trial court jurisdiction.

- Unconstitutionality of statute under which conviction obtained.

- Indictment showing on its face that no offense was committed.

- Denial of speedy trial right.

- Incapacity to stand trial due to drug use.

- Language barrier to understand the proceedings.

- Denial of counsel.

- Coerced confession.

- Suppression of helpful evidence by prosecutor.

- State's knowing use of perjured testimony.

- Falsification of a transcript by prosecutor.

- Unfulfilled plea bargains.

- Information in pre-sentence report erroneous.

- Double jeopardy.

- Irregularities in arrest.

- Excessiveness or denial of bail.

- No preliminary hearing.

- Illegal detention prior to arraignment.

- Irregularities or errors in arraignment.

- Challenges to the composition of grand jury of its procedures.

- Failure to provide a copy of the indictment to the defendant.

8

- Improper venue.

- Pre-indictment delay.

- Refusal of continuance.

- Refusal to subpoena witnesses.

- Prejudicial joinder of defendants.

- Lack of full public hearing.

- Nondisclosure of Grand Jury minutes.

- Refusal to turn over witness notes after witness has testified.

- Claims concerning use of informers to convict.

- Constitutional errors in evidentiary rulings.

- Instructions to the jury.

- Claims by prejudicial statements by trial judges.

- Claims by prejudicial statements by prosecutor.

- Acquittal of co-defendant on same charge.

- Defendant's absence from part of the proceedings.

- Improper communications between prosecutor or witnesses and jury.

- Amount of time served on sentence, credit for time served.

## Asserted Grounds:

- Prejudicial pretrial publicity.

- Involuntary guilty plea.

- Mental competency at the time of crime.

- Mental competency at the time of trial.

- Failure of counsel to take an appeal.

9

- Consecutive sentences for same transaction.

- Ineffective assistance of counsel.

- Defects in indictment.

- Claim of incompetence at time of the offense, as opposed to time of trial.

- Sufficiency of evidence.

- Question of actual guilt upon an acceptable guilty plea.

- Severer sentence than expected.

- Excessive sentence.

- Mistaken advice of counsel as to parole or probation eligibility.

## C. THE STATE'S RESPONSE TO THE PETITION

On February 1, 2016, the Respondent, by and through Assistant Prosecutor John H. McGinnis, IV, Esq., filed a Response addressing the Petitioner's Petition for Writ of Habeas Corpus. The Respondent agrees with the Petition's legal standard as set forth therein, but disputes the Petitioner's contention that he received ineffective assistance of counsel for recommending an unfavorable best interest plea. The Respondent contends that the underlying record does not indicate that the Petitioner would have received a more favorable result had the matter proceeded to trial.

The Respondent contends that the record concerning the plea demonstrates that the Petitioner made a voluntary, knowing, and intelligent entry of his guilty plea. The record is clear that the Petitioner was not suffering under any mental defect or alcoholism that affected his ability to participate in the proceedings, and further, that the Petitioner acknowledged that some of the responses written in the paperwork in support of his

10

petition to enter a plea were in his own hand. During the colloquy with the Court, the Respondent contends that the record is clear that the Petitioner met with his counsel numerous times and that the plea was the result of a free and voluntary decision by the Petitioner.

The Respondent argues that the Petitioner's sentence is within the statutory authority for the offenses to which he pled guilty and does not offend constitutional constructs or shocks the conscience.

In closing, the Respondent asks the Court to deny the Petition for habeas relief.

## D. THE OMNIBUS HABEAS CORPUS HEARING

On February 2, 2016[7], the Court conducted the omnibus habeas corpus proceeding in this action. The Petitioner appeared in person, and by counsel, Paul R. Cassell, Esq. The State of West Virginia was represented by John H. McGinnis, IV, Esq., Assistant Prosecuting Attorney. The Petitioner was sworn and the Court reviewed his rights in an omnibus habeas corpus proceeding. The Petitioner was advised that he had to raise all grounds in his Petition or be forever barred from raising the same, absent those special exceptions set forth, *infra*. In response to the Court's inquiry, the Petitioner stated that he was not under the influence of alcohol or drugs at the time of the hearing that would have affected his ability to understand the proceedings. The Court reviewed the *Losh* Checklist with the Petitioner in detail, ensuring that every ground that he wished to raise was before the Court in this proceeding. The Petitioner testified on his own behalf. The parties stipulated to all the evidence and agreed to admit the entire criminal file as evidence and therefore part of the record in this habeas proceeding.

---

[7] An Order was entered on this date allowing the Petitioner to file an amended brief by February 14, 2016, and permitted the Respondent to file a reply to same by March 4, 2016. However, no further pleadings were filed in this matter to date, accordingly, the Court FINDS the matter ripe for decision.

11

The Petitioner testified that he and his appointed counsel, Paul Cassell, Esq., worked together on this habeas proceeding for a long time and had numerous meetings at the prison before the omnibus hearing. The Petitioner testified that he met with his habeas counsel and reviewed the *Losh* Checklist with him.

The Petitioner testified that Ward Morgan, Esq. was appointed as his counsel in the underlying criminal matter. The Petitioner testified that he entered a guilty plea to sexual offenses that related to all three child victims. The Petitioner testified that with regard to his nephew, he admitted to committing certain acts with him, but not with the other two child victims:

Mr. Cassell: You taught your nephew how to masturbate. Is that fair to say?

Petitioner: Yes, sir.

Mr. Cassell: Did you ever commit any offense with regard to the other two children?

Petitioner: No, sir.

Mr. Cassell: And have you always maintained that you were innocent with regard to those two?

Petitioner: Yes, sir.

Mr. Cassell: And in fact, in your plea paperwork you put down that you were doing it for your best interest.

Petitioner: Yes, sir.

Mr. Cassell: Now when you - - when you're talking about your best interest in entering that plea, are you talking about your best interest or somebody else's?

Petitioner: Well, it was over my step-daughter.

Mr. Cassell: All right. Describe that for the Court, what - - what was in your mind at the time you entered your plea of guilty about your step-daughter?

Petitioner: Well, I didn't want her to go thru [sic] court then when she was small because I thought maybe she would take a fit, start crying, you know.

Mr. Cassell: So you did enter your - - are you - - were you thinking about her when you entered your plea of guilty then? Is that why you were doing it because you didn't want to upset her?

Petitioner: Yes, sir.[8]

Additionally, the Petitioner testified that he had a severe drinking problem at the time of the crimes, back in 2003:

Mr. Cassell: Did that affect your ability to understand what you were doing?

Petitioner: Yeah.

Mr. Cassell: How much did you drink in a day?

Petitioner: Two or three cases, or more.

_____

[8] Transcript of Omnibus Habeas Corpus hearing, February 2, 2016, at Pages 16 – 17.

13

Mr. Cassell:     All right. And do you have to drink? If you didn't drink

what would happen to you?

Petitioner:      I'd - - I had what you'd say depression and stuff like that.

Mr. Cassell:     All right. Were you on any other medication back in 2003?

Petitioner:      Just depression medication then.[9]

\*\*\*\*\*\*\*\*\*\*\*\*\*

Mr. Cassell:     Who had diagnosed you with depression?

Petitioner:      I don't remember that doctor's name.

Mr. Cassell:     We've tried to figure that out and you can't remember that,

who - - which doctor it was. Is that right?

Petitioner:      That's right.

Mr. Cassell:     But you had been diagnosed with mental health issues and

you were on medication for those issues?

Petitioner:      Yes, sir.[10]

In addition to depression and alcoholism, the Petitioner testified that he had a learning disability:

Mr. Cassell:     Now on top of the alcoholism and the mental health issues

that you've faced, you've always had difficulty with

learning. Is that fair to say?

Petitioner:      Yes, sir.

Mr. Cassell:     Describe for the Court [ ] what happened to you?

---

[9] *Id.* at Page 17, Lines 19 – 23; at Page 18, Lines 1 – 7.
[10] *Id.* at Page 18, Lines 13 – 22.

14

Petitioner: When I was a little baby I had rheumatic fever when I was little. It settled on my brains and in my joints and it's got my brains - - it takes five years for my brains to catch up with my body.

Mr. Cassell: Have you always had difficulty reading?

Petitioner: Yes, sir.

Mr. Cassell: Can you read real well now?

Petitioner: I can read but I still don't understand it.

Mr. Cassell: For example, when I sent you this amended petition that I'm showing you right now, it's the Amended Petition - - I'm sorry. The Petition for Writ of Habeas Corpus that was filed in this case, could you read this and understand it without me explaining it to you?

Petitioner: I could read it but like I said, it's - - I had to keep on reading or somebody else reads it to me, then I can understand it.[11]

The Petitioner testified that his difficulties in understanding extended to the legal documents as well as to what was going on in the underlying criminal case. The Petitioner recalled that he was sent to a doctor to evaluate his mental competency and criminal responsibility and that the doctor found that he was competent and criminally responsible. The Petitioner recalled that he entered his guilty pleas to the offenses and that he met with his lawyer and reviewed the plea paperwork with his lawyer. However,

---

[11] *Id.* at Page 19.

15

the Petitioner could not remember how long his lawyer reviewed the plea with him, but he recalled that he felt "hurried" through the plea process:[12]

Mr. Cassell: Did you feel like you fully understood what you were doing that day?

Petitioner: I thought I did.

Mr. Cassell: All right. And did you?

Petitioner: No.[13]

************

Mr. Cassell: Did you realize back then that you were - - that that plea would subject you to 80 to 190 years in prison? Did you understand that?

Petitioner: No.

Mr. Cassell: Did you understand that you - - that the sentence you received, that you wouldn't be eligible for parole for 25 years? Did you understand that?

Petitioner: Not really. I didn't know I would be 70 years old by the time I do.[14]

************

Mr. Cassell: You stated that you were entering a plea - - a best interest plea with regard to the two others. Not your nephew, the other two. Is that right?

Petitioner: Yes, sir.

---

[12] *Id.* at Page 22, Lines 5 – 6.
[13] *Id.* at Page 22, Lines 7 – 11.
[14] *Id.* at Page 23, Lines 1 – 9.

16

Mr. Cassell:   Did your lawyer - - did he have a chance to review

with you what a best interest plea means?

Petitioner:   No, sir.[15]

The Petitioner testified that he had a long history of being treated at the Mercer County Health Department since he was a young boy, however, he and his habeas counsel were unable to locate those records. Nevertheless, the Petitioner testified that his treatment concerned issues that presented from the rheumatic fever he suffered as a child; he had many nose bleeds. The Petitioner could not recall if he had any other treatment for his mental health issues as a child.

With regard to prejudicial pretrial publicity, the Petitioner could not recall if his criminal case was in the newspapers back in 2003, however, he wanted to assert that ground just in case it might have been. As for the involuntary guilty plea ground alleged in his *Losh* Checklist, the Petitioner testified that it was involuntary as a result of his not understanding what he was doing at the time.[16] The Petitioner further testified that he was not mentally competent at the time of trial was due to his alcoholism and his intellectual deficits, or "being slow."[17] The Petitioner testified that his counsel failed to take an appeal in the criminal matter, and that he wanted his trial counsel to appeal because of the lengthy sentence he received.[18] The Petitioner also testified that his sentences were too harsh, as they were "several consecutive sentences" for the same transaction.[19]

---

[15] *Id.* at Page 24, Lines 1 – 7.
[16] *Id.* at Page 26, Lines 10 – 13.
[17] *Id.* at Page 26, Lines 14 – 17.
[18] *Id.* at Page 26, Lines 18 – 22; Page 27, Lines 1 – 2.
[19] *Id.* at Page 27, Lines 4 – 8.

Moreover, the Petitioner testified that his trial counsel was ineffective, the details of which were explored at length in the petition filed on his behalf.[20] The Petitioner agreed that habeas counsel wanted to raise the ground of defects in the indictment insofar as it did not contain enough specific facts.[21] The Petitioner asserted the claim that he was not competent at the time of the offenses as a result of his alcoholism, his "being slow", and his depression.[22]

With regard to the sufficiency of the evidence, the Petitioner testified as follows:

Mr. Cassell: The sufficiency of the evidence, that relates to the other two children that you say you didn't do anything to them. Is that right?

Petitioner: That's right.

Mr. Cassell: Not your nephew, but the other two.

Petitioner: Yes, sir.

Mr. Cassell: The question of actual guilt upon an acceptable guilty plea, again relates to the fact that you claim you're innocent with regard to the other two children, your step-daughter and the other child, you're innocent of all of those. Right?

Petitioner: Yes, sir.[23]

The Petitioner testified that he wanted his habeas counsel to raise the issue of severer sentence than expected because he did not know what to expect as far as his

---

[20] *Id.* at Page 27, Lines 9 – 12.

[21] *Id.* at Page 27, Lines 13 – 23.

[22] *Id.* at Page 28, Lines 1 – 8.

[23] *Id.* at Page 28, Lines 9 – 20.

sentence went. The Petitioner testified that his contention regarding the excessive sentence or proportionality of his sentence is outlined in the brief he submitted in support of his petition for habeas relief.

The Petitioner next testified as to his claim of mistaken advice of counsel as to parole or probation eligibility:

> Mr. Cassell:     ... how long did you think you were going to have to pull when you entered and signed that plea agreement?
>
> Petitioner:     Well, the only thing I know is that 25 years.
>
> Mr. Cassell:     All right. Did you think that's what you were going to get that when you signed the plea agreement? When you signed the agreement or when the judge sentenced you?
>
> Petitioner:     It was after the judge sentenced me.
>
> Mr. Cassell:     Before he sentenced you, how long did you think you were going to - - before you found out exactly how much you were going to have to do, what did you think you were going to get?
>
> Petitioner:     I really didn't know what I was going to get.
>
> Mr. Cassell:     Had your lawyer given you any advice as to what kind of sentence to expect?
>
> Petitioner:     No.[24]

---

[24] *Id.* at Page 29, Lines 9 – 22; Page 30, Lines 1 – 5.

19

In closing, the Petitioner testified that he is not guilty of the offenses relating to his son and step-daughter; the only conduct the Petitioner admitted guilt for was teaching his nephew how to masturbate.[25]

Counsel for the Respondent had no questions for the Petitioner.

The next and last witness, Mr. Ward Morgan, Esq., was called by the Respondent. Upon questioning by the Court and by his habeas counsel, the Petitioner waived his attorney-client privilege to allow Mr. Morgan to testify in this proceeding. Mr. Morgan testified that he was appointed to represent the Petitioner in the underlying criminal proceeding as well as in the collateral abuse and neglect proceeding. Mr. Morgan testified that he reviewed the criminal charges against the Petitioner as well as the allegations in the abuse and neglect proceeding, as they all stemmed from the same conduct. Mr. Morgan was aware that during the forensic interviews of the child victims, the allegations against the Petitioner "were pretty severe."[26] Mr. Morgan recalled that a relative of the Petitioner's was being tried for identical charges, involving the daughter, in McDowell County Circuit Court. Mr. Morgan testified that he monitored that trial and learned that the Petitioner's name came up during same. The accused in that case was convicted of all counts, which "really changed the dynamic for us up here."[27] Mr. Morgan testified concerning the allegations involving the McDowell County matter and the young female victim:

> Mr. McGinnis: Now did she disclose - - explain that. How
>
> could two people be on trial for the same - -

---

[25] *Id.* at Page 30, Lines 8 – 15.

[26] *Id.* at Page 35, Line 4.

[27] *Id.* at Page 35, Lines 21 – 22.

20

Mr. Morgan:    No, they were different allegations in McDowell County because it occurred in McDowell.

Mr. McGinnis:    Okay.

Mr. Morgan:    The allegations were that [the Petitioner] would take his daughter down there for D      . I think D      was a brother-in-law or something.

But that was - - I didn't hire an investigator, if that's what you're asking. But I did conduct my own investigation and a lot of that had to do with monitoring that three-day trial.[28]

Mr. Morgan explained that a lot of the discovery had been disclosed already in the collateral abuse and neglect case, and that the testimony from that matter would have been the same in the criminal trial.[29] However, the Petitioner did not want to put the children through a trial:

Mr. Morgan:    . . . And they were talking about - - I forget how old the children were. I know the boy was young but I forget how old the girl was, but you know, there was talk about having them testify and [the Petitioner] didn't want that to happen. I mean, he

---

[28] *Id.* at Page 36, Lines 5 – 16.
[29] *Id.* at Page 37, Lines 1 – 4.

21

did not want his children to testify. And he had made some admissions in that abuse and neglect case which obviously wouldn't come in, but you know.[30]

The Petitioner's trial counsel testified that he did discuss the plea with the Petitioner and that they had spent much time together at the time:

Mr. McGinnis: So now when you - - when you walked in to discuss the plea offer with [the Petitioner], do you think that you had a good understand [sic] of all the facts in the case?

Mr. Morgan: I do. I do.

Mr. McGinnis: Now did you discuss all of that with [the Petitioner]?

Mr. Morgan: To the best of my recollection, I did. And I think I disclosed all of my timesheets to counsel, so I would defer to my timesheets. But yes, I think I spent lots of time with him.[31]

Mr. Morgan also testified that he believed that the Petitioner understood the plea offer and the time that he potentially faced:

Mr. McGinnis: Okay. And do you think at the time that he understood?

---

[30] *Id.* at Page 37, Lines 4 – 11.
[31] *Id.* at Page 37, Lines 12 – 22.

22

| Mr. Morgan: | Yes. Clearly, I think he did. |
| | |

He - - I explained to him that the offer was the best that he was going to get. I forget who tried for the State. Debra Garton. Okay. But this was the best it was going to get, and I explained to him to that it was, for all practical purposes, a life sentence and that he'd probably never get out if he took this plea. But if we went to trial probably the same thing that happened to D₁ was going to happen to him. And I remember - - and you know, this was a concern. He asked me if they would teach him woodworking in prison and I said probably and he said good deal. And he took the deal.

| Mr. McGinnis: | Okay. Now - - |
| Mr. Morgan: | And I think he understood that - - that it would be a life sentence.[32] |

Mr. Morgan agreed with habeas counsel that the Petitioner seemed slow, and that he took that into account when dealing with him. Mr. Morgan recalled that the Petitioner claimed that he could not read, but he believed that the Petitioner "was probably a little craftier than he let on."[33] Nevertheless, Mr. Morgan testified that he would explain what

---

[32] *Id.* at Page 38, Lines 1 – 19.
[33] *Id.* at Page 39, Lines 8 – 9.

23

the trial would involve and everything about the case; to his recollection, Mr. Morgan testified that much "hinged on the trial in McDowell County with his brother-in-law, D___."[34] Mr. Morgan advised the Petitioner of the allegations in the McDowell County case, and that the defendant lost his trial, and received a 100 year or 150 year sentence as a result.[35] It was at that point that the Petitioner told Mr. Morgan to "work the best deal you can"; Mr. Morgan admitted that "it's the only time I have ever to my knowledge plead [sic] anyone essentially to a life sentence."[36]

Mr. Morgan testified that he did not force the Petitioner to take the plea offer, but explained to the Petitioner the reality of the situation.[37] Mr. Morgan testified that the Petitioner was aware of what the child victims would say during the criminal trial, due to his being present during the abuse and neglect proceeding:

| Mr. McGinnis: | And he was always present? |
|---|---|
| Mr. Morgan: | Yes. There were transcripts as I recall. |
| Mr. McGinnis: | Okay. |
| Mr. Morgan: | And there [sic] were pretty egregious. And I don't recall him ever maintaining his innocence's [sic]. I don't, no. |
| Mr. McGinnis: | Okay. |
| Mr. Morgan: | That's it. I mean, any investigation I did I already had it, so I didn't see a need for a private investigator. |

---

[34] *Id.* at Page 39, Lines 14 – 18.
[35] *Id.* at Page 39, Lines 20 – 22.
[36] *Id.* at Page 40, Lines 2 – 6.
[37] *Id.* at Page 40, Lines 18 – 20.

24

| | |
|---|---|
| Mr. McGinnis: | A lot of that had been done for you thru [sic] the Department? |
| Mr. Morgan: | It had. |
| Mr. McGinnis: | Okay. |
| Mr. Morgan: | And I went over all of that with him. |
| Mr. McGinnis: | So you went all - - you went over all of this discovery plus he was present in all of the abuse and neglect hearings? |
| Mr. Morgan: | Yes.[38] |

With regard to the Petitioner's understanding of the plea and the process Mr. Morgan followed to review it with the Petitioner, Mr. Morgan testified as follows:

| | |
|---|---|
| Mr. McGinnis: | Now when it came to the plea, did you also - - did you take extra time to go over his rights with him? |
| Mr. Morgan: | I did. I was going over the petition this morning and I saw where I had handwritten that in. I wrote it out. Typically I like my clients to fill them out but he wasn't able to so I wrote - - I wrote all that out and had him sign it and I would have gone over all that with him. I probably had to read everything to him. I probably had to read everything to |

---

[38] *Id.* at Page 41, Lines 4 – 22.

25

|               |                                                                                      |
|---------------|--------------------------------------------------------------------------------------|
|               | him. And I'm sure I did. I mean, I would never force him to do this.                  |
| Mr. McGinnis: | But now at the time you walked in and sat down at that plea hearing that day, were you doing what your client wanted you to do? |
| Mr. Morgan:   | Yes.                                                                                 |
| Mr. McGinnis: | Do you believe that [the Petitioner] was fully informed as to the case against him?  |
| Mr. Morgan:   | Yes.                                                                                 |
| Mr. McGinnis: | Do you think [the Petitioner] fully understood the plea he was entering into?        |
| Mr. Morgan:   | Yes.[39]                                                                             |

In reference to the Petitioner's actual sentence, Mr. Morgan testified that it was better than what the Petitioner was potentially facing:

|               |                                                                                      |
|---------------|--------------------------------------------------------------------------------------|
| Mr. McGinnis: | And as we sit here today, you got a much better result out of the sentencing than you had anticipated, didn't you? |
| Mr. Morgan:   | I don't recall what he got but - -                                                    |
| Mr. McGinnis: | 25 to 55 years?                                                                       |
| Mr. Morgan:   | Yes. That was much better than what he was looking at.[40]                            |

---

[39] *Id.* at Page 42, Lines 2 – 22.
[40] *Id.* at Page 43, Lines 1 – 7.

Mr. Morgan testified that he believed that he had gone over everything with the Petitioner at the time of his plea, and that he fully understood what he was doing, and that the Petitioner entered his plea freely and voluntarily.[41]

On cross-examination, Mr. Morgan agreed that the plea paperwork submitted during the plea hearing contained a statement from the Petitioner that Mr. Morgan wrote for the Petitioner at his request:

Mr. Cassell: It says, "I showed my little brother how to masturbate. I don't recall what happened with L          and K         when I was drinking, however I believe it is in my best interest to plead guilty." Did you review that? Did you review that with him?

Mr. Morgan: I wrote that for him. Yes.[42]

Mr. Morgan admitted that he could not recall if the plea was a best interest plea, but that it would not surprise him if it had been,[43] but he had difficulties with it just the same:

Mr. Cassell: So is it troublesome for you to enter into a best interest plea that results in a life - - in what you believe in effect a life sentence?

Mr. Morgan: Yes. Yes, it is. And struggled with this, I recall because I've never done this before. But I recall the evidence being pretty overwhelming and the kids, at least K          was going to testify."[44]

---

[41] *Id.* at Page 44, Lines 13 – 22.
[42] *Id.* at Page 46, Lines 1 – 12.
[43] *Id.* at Page 46, Lines 19 – 20.
[44] *Id.* at Page 47, Lines 14 – 20.

27

Mr. Morgan did not recall the Petitioner having much difficulties understanding the case against him or the plea process:

Mr. Cassell: Now you had to deal with [the Petitioner] for a long time and I've worked with him here for quite a while. Can you - - were there times when you explained something to him and then shortly thereafter he doesn't understand and you'd have to explain it to him again? Did you experience that?

Mr. Morgan: I don't recall. I do recall that I thought there was some malingering. In [sic] thought he was smarter and craftier than what he let on, I mean I do, given his history and you know, what I had learned about him over the years, running businesses and that sort of thing.

Mr. Cassell: Have you ever asked - - have you ever had a client, as part of their decision of whether or not to take a plea, .. want to know if they're going to do woodworking in prison?

Mr. Morgan: That's the only time. That's why it stands out.

Mr. Cassell: Was that an odd response to a plea to an effectively life sentence?

Mr. Morgan: Yes, it was. Yes, it was.

28

Mr. Cassell: And do you think he was malingering with regard to that statement?

Mr. Morgan: I don't know, but I do recall him saying that. And that's not - - that wasn't the tipping point. I think he was just trying to justify to himself because he saw what happened to D    .[45]

With regard to the Petitioner's intellectual challenges and the promptness in which the plea was entered after the competency evaluation report was submitted to the Court, Mr. Morgan admitted that it probably was not the best of circumstances in which the Petitioner entered his plea, but the trial date may have been coming up soon.[46] However, the imminent trial presented a difficult situation:

Mr. Cassell: Actually Mr. Boggess was there that day but it was - - you were right. It was Ms. Garton's case.

Mr. Morgan: And she was, you know, - - she was pretty aggressive. And like I said, the allegations were very egregious and, you know, there was some statements in the collateral case obviously that were not admissible but that implicated him in much - - and he was concerned about his children's welfare. I mean, I will - - I do recall that. He did not want to put them thru [sic] a trial.

---

[45] *Id.* at Page 47, Lines 21 – 23; Page 48; Page 49, Lines 1 – 2.
[46] *Id.* at Page 50, Lines 19 – 22; Page 51, Lines 1 – 3.

29

Mr. Cassell:    And part of - - and part of your argument at sentencing, asking for mercy, was that - - and I'm quoting here "Clearly shows that he's mentally retarded, has a very low IQ of 63. Quote 'Extremely low' is how the report refers to it, that he's educationally mentally retarded, and has severe visual perception problems of basically a five-year-old."

So he has significant learning difficulties and you would acknowledge those even at the time?

Mr. Morgan:    Yes. Clearly he did. In fact, he had, you know - - he had been around and I don't know if he was on disability or not but he made money. He had jobs. He worked.[47]

On redirect examination, Mr. Morgan testified that despite doing the plea the same day as the suppression hearing and the same day he received the competency evaluation back, he had sufficient time to complete the plea paperwork with the Petitioner so that he understood what he was doing.[48]

In response to questioning from the bench, Mr. Morgan testified that he observed the McDowell County trial concerning the Petitioner's relative and that the defendant was convicted of all counts.[49] Mr. Morgan recalled that Phyllis Hasty was used as a witness to bring in the young female's statements, and that the Mercer County Assistant Prosecuting

---

[47] *Id.* at Page 51, Lines 5 – 23; Page 52, Lines 1 – 4.
[48] *Id.* at Page 52, Lines 11 – 17.
[49] *Id.* at Page 54, Lines 7 – 8.

30

Attorney[50] planned to do the same in the Petitioner's criminal trial.[51] Mr. Morgan did not recall any pretrial publicity of the Petitioner's case.[52] Mr. Morgan reiterated to the Court that he believed that the Petitioner voluntarily pled and that he had no doubt that the Petitioner knew what he was doing, regardless of any intellectual deficits.[53] Mr. Morgan further testified that the Petitioner did not ask him to appeal his criminal case.[54] Mr. Morgan admitted that he did not find any defects in the indictment, although he may have overlooked something.[55] Mr. Morgan further testified that with regard to the sufficiency of the evidence, he recalled that the young female victim was going to testify against the Petitioner, as she was one of several victims in the McDowell County criminal case.[56] Mr. Morgan also denied that he made any comments to the Petitioner that he would get out on parole.[57]

## III. DISCUSSION

### A. Habeas Corpus Defined

Habeas Corpus is "a suit wherein probable cause therefore being shown, a writ is issued which challenges the right of one to hold another in custody or restraint." Syl. Pt. 1, *State ex rel. Crupe v.* Yardley, 213 W.Va. 335, 582 SE2d 782 (2003). "The sole issue presented in a habeas corpus proceeding by a prisoner is whether he is restrained of his liberty by the due process of law." *Id.* at Syl. Pt. 2. "A Habeas Corpus petition is not a

---

[50] At the time of this criminal proceeding, Ms. Debra Garton typically tried all the sexual offense cases for the Mercer County Prosecutor's office.

[51] *Id.* at Page 53, Lines 19 – 23; Page 54, Lines 1 – 6.

[52] *Id.* at Page 54, Lines 13 – 17.

[53] *Id.* at Page 54, Lines 18 – 22; Page 55, Lines 1 – 4.

[54] *Id.* at Page 55, Lines 17 – 19.

[55] *Id.* at Page 56, Lines 5 – 8.

[56] *Id.* at Page 56, Lines 9 – 15.

[57] *Id.* at Page 57, Lines 16 – 20.

substitute for a writ of error[58] in that ordinary trial error not involving constitutional violations will not be reviewed." *Id.* at Syl.Pt.3.

## B. The Availability Of Habeas Corpus Relief

In *State ex rel. McCabe v. Seifert*, 220 W.Va. 79, 640 S.E.2d 142 (2006), the West Virginia Supreme Court of Appeals delineated the circumstances under which a post-conviction habeas corpus hearing is available as follows:

(1) Any person convicted of a crime and

(2) Incarcerated under sentence of imprisonment therefore who contends

(3) That there was such a denial or infringement of his rights as to render the conviction or sentence void under the Constitution of the United States or the Constitution of this State or both, or

(4) That the court was without jurisdiction to impose sentence, or

(5) That the sentence exceeds the maximum authorized by law, or

(6) That the conviction or sentence is otherwise subject to collateral attack upon the ground of alleged error heretofore available under the common-law or any statutory provision of this State, may without paying a filing fee, file a petition for Writ of Habeas Corpus Ad Subjiciendum, and prosecute the same, seeking release from such illegal imprisonment, and correction of the sentence, the setting aside of the plea, conviction, and sentence of other relief.

See also, W.Va. Code § 53-4A-1(a)(1967)(Repl.Vol. 2000).

Our post-conviction habeas corpus statute, W.Va. Code §53-4A-1(a) *et seq.*, "clearly contemplates that a person who has been convicted of a crime is ordinarily entitled, as a matter of right, to only one post-conviction habeas corpus proceeding during

---

[58] A writ of error is a writ issued by an appellate court to the court of record where a case was tried, requiring that the record of the trial be sent to the appellate court for examination alleged errors.

which he must raise all grounds for relief which are known to him or which he could, with reasonable diligence, discover." Syl. Pt. 1, *Gibson v. Dale*, 173 W.Va. 681, 319 S.E.2d 806 (1984). At subsequent Habeas Corpus hearings, any grounds raised at a prior Habeas Corpus hearing are considered fully adjudicated and need not be addressed by the Court. *Losh v. McKenzie*, 166 W.Va. 762, 277 S.E.2d 606 (1981).

Yet, some limited exceptions apply to this general rule: "[a] prior omnibus Habeas Corpus hearing is *res judicata* as to all matters raised and as to all matters known or which with reasonable diligence could have been known; however, an applicant may still petition the court on the following grounds: (1) ineffective assistance of counsel at the omnibus habeas corpus hearing; (2) newly discovered evidence; (3) or, a change in the law, favorable to the applicant, which may be applied retroactively." Syl. Pt. 4, *Losh v. McKenzie*, 166 W.Va. 762, 277 S.E.2d 606 (1981).[59]

A habeas corpus proceeding is civil in nature. "The general standard of proof in civil cases is preponderance of the evidence." *Sharon B.W v. George B.W.*, 203 W.Va. 300, 303, 507 S.E.2d 401, 404 (1998).

The West Virginia Supreme Court of Appeals has articulated the way for a circuit court to review habeas corpus petitions: "Whether denying or granting a petition for a writ of habeas corpus, the circuit court must make adequate findings of facts and conclusions of law relating to each contention advanced by the petitioner, and state the

---

[59] On June 16, 2006, the West Virginia Supreme Court of Appeals held that a fourth ground for Habeas relief may exist in cases involving testimony regarding serology evidence. To summarize, the Court held as follows:

> A prisoner who was convicted between 1979 and 1999 and against whom a West Virginia State Police Crime Serologist, other than a serologist previously found to have engaged in intentional misconduct, offered evidence may bring a petition for writ of Habeas Corpus based on the serology evidence even if the prisoner brought a prior Habeas Corpus challenge to the same serology evidence and the challenge was finally adjudicated. *In re Renewed Investigation of State Police Crime Laboratory, Serology Div.*, 633 S.E.2d 762, 219 W.Va. 408 (2006).

33

grounds upon which the matter was determined." *Coleman v. Painter*, 215 W.Va. 592, 600 S.E.2d 304 (2004).

## C. Final List Of Grounds Asserted For Issuance Of A Writ Of Habeas Corpus; The Court's Rulings Thereon

The Court has carefully reviewed all the pleadings filed in this action, the transcript of the omnibus habeas corpus hearing, the Court file and transcripts in the underlying criminal action, and the applicable case law. The Court has also reviewed the *Losh* checklist filed by the Petitioner with his Petition for Writ of Habeas Corpus. The matters before this Court for review are:

1. Whether trial counsel was ineffective on the following grounds:

   a. Failure to effectively handle the Petitioner's mental illness issues and alcohol abuse or further explore these matters with regard to plea negotiations; and

   b. Failure to consider the Petitioner's lack of prior felony convictions, coupled with his alcohol and mental illness issues with regard to recommending the plea that subjected the Petitioner to a veritable life sentence;

2. Whether the Petitioner's plea was fully and voluntarily made;

3. Whether the Petitioner received a disproportionate sentence;

4. Whether the Petitioner's Federal and State constitutional rights were violated by the inadequate indictment;

5. Whether the other matters raised by the Petitioner in his *Losh* Checklist have merit, specifically: whether there was prejudicial pretrial publicity; failure of counsel to take an appeal; whether the Petitioner was mentally competent at

34

the time of the crime; whether the Petitioner received mistaken advice of counsel as to parole or probation eligibility; and whether the evidence was sufficient to sustain his guilty plea.

The other issues raised in the Petitioner's *Losh* Checklist are subsumed in the above referenced matters, and are addressed, *infra*.

## 1. Was counsel ineffective?

The West Virginia Supreme Court has recognized that the Sixth Amendment to the Constitution of the United States and Article 3, Section 14 of the Constitution of West Virginia mandates that a Defendant, in a criminal proceeding receive "competent and effective assistance of counsel of counsel." *State ex rel. Strogen v. Trent*, 469 S.E.2d 7, 9-10 (W.Va. 1996)(numerous citations omitted).

In West Virginia courts, claims of ineffective assistance of counsel are to be governed by the two-pronged test established in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L. Ed.2d 674 (1984): (1) Counsel's performance was deficient under an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. Syl. Pt. 5, *State v. Miller*, 194 W. Va. 3, 459 S.E.2d 114 (1995). The West Virginia Supreme Court of Appeals has also stated that: "Where counsel's performance, attacked as ineffective arises from occurrence involving strategy, tactics, and arguable courses of action, his conduct will be deemed effectively assistive of his client's interests, unless no reasonably qualified defense attorney would have so acted in the defense of the accused." Syl. Pt. 5, *State ex rel Humphries v. McBride*, 220 W.Va. 362, 645 S.E.2d 798

35

(2007); Syl. Pt. 21, *State v. Thomas*, 157 W.Va. 640, 203 S.E.2d 445 (1974). Further, the West Virginia Supreme Court of Appeals has also held that:

> [i]n reviewing counsel's performance, courts must apply an objective standard and determine whether, in light of all the circumstances, the identified acts or omissions were outside the broad range of professionally competent assistance while at the same time refraining from engaging in hindsight or second-guessing of trial counsel's strategic decisions. Thus, a reviewing court asks whether a reasonable lawyer would have acted, under the circumstances, as defense counsel acted in the case at issue.

Syl. Pt. 6, *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995).

The United States Supreme Court has confirmed the crucial role of the plea bargaining process and the constitutional entitlement to effective assistance of counsel in that process. *Missouri v. Frye*, 80 U.S. 4253 (2012); *Lafler v. Cooper*, 80 U.S. 4244 (2012).

The Court is further aware that given the issue raised with regard to the Petitioner's competency at the time of the crimes and at the time of plea negotiations that resulted in the guilty plea being entered on March 8, 2004, the Court is guided by the long-held precedent: "[w]hen a trial judge is made aware of a possible problem with defendant's competency, it is abuse of discretion to deny a motion for psychiatric evaluation." Syl. Pt. 4, in part, *State v. Demastus*, 165 W.Va. 572, 270 S.E.2d 649 (1980). Further, the West Virginia Supreme Court of Appeals has also held in *State v. Sanders*, 209 W.Va. 367, 549 S.E.2d 40 (2001):

> Importantly, since the right not to be tried while mentally incompetent is subject to neither waiver nor forfeiture, a trial court is not relieved of its objection to provide procedures sufficient to protect against the trial of an incompetent defendant merely because no formal request for such has been put forward by the parties...In other words, a trial court has an affirmative duty to employ adequate procedures for determining competency, once the issue has come to the attention of the Court, whether

36

through formal motion by one of the parties or as a result of information that becomes available in the cause of criminal proceedings.

The West Virginia Supreme Court of Appeals has also confirmed its process for determining whether a broad inquiry into a defendant's mental competency is constitutionally required in *Sanders*:

> Evidence of irrational behavior, a history of mental illness or behavioral abnormalities, previous confinement for mental disturbance, demeanor before the trial judge, psychiatric and lay testimony bearing on the issue of competency, documented proof of mental disturbance are all factors which a trial judge may consider in the proper exercise of his (or her) discretion (to order inquiry into the mental incompetence of a criminal defendant.)

*Sanders,* Syl. Pt. 6, following Syl. Pt. 5, *State v. Arnold*, 159 W.Va. 158, 219 S.E.2d 922 (197

In a nutshell, the Petitioner asserts that his counsel was ineffective by failing to address the effects of the Petitioner's long history of mental illness and alcohol abuse vis á vis the allegations contained in the Indictment, which failure was ultimately manifested when the Petitioner's counsel recommended to his client to accept the plea bargain.

However, the underlying criminal record supports the Respondent's assertion that the Petitioner's counsel did indeed explore the Petitioner's mental issues: By Order entered on December 10, 2003, the Court granted the Petitioner's motion for a competency evaluation. Per the evaluation report generated by Charleston Psychiatric Group, Inc., the Petitioner was evaluated on February 2, 2004, and subsequently deemed competent to stand trial. Further, the evaluation determined that the Petitioner had possessed adequate comprehension of the nature of the charges against him, as well as the possible penalties for the offenses charged, and was able to assist his counsel in his own defense.

Moreover, pursuant to the competency evaluation, the Petitioner was determined to be criminally responsible for his crimes and had no mental disease or defect which would have prevented him from appreciating the wrongfulness of his conduct, nor which would have prevented him from conforming his conduct to the requirements of the law. This report was filed in the official court file on March 4, 2004; an Order wherein the Court made the appropriate findings and conclusions as those reached in the report was entered that same day. No objection was made to the findings and conclusions of the evaluation report, and no further hearing concerning those findings and conclusions was requested or held with regard to those drawn in that report. In other words, the Court's finding of the Petitioner's competence and criminal responsibility was not disputed by any party.

During the plea hearing held on March 8, 2004, it is notable that during the colloquy between the Court and the Petitioner, and **after** the Court outlined the nature of the offenses and the maximum penalties that he was facing as a result, the Petitioner advised the Court that his entry of a guilty plea was voluntary:

The Court:   Sir, is your offer to enter this plea your own free and voluntary act? Are you entering this plea of your own free will?

Petitioner:   Yes, sir.[60]

It is also important to note that, towards the end of the plea hearing, the Court again inquired of the Petitioner if he still wished to enter his guilty plea after having again described the offenses to which the Petitioner would plead guilty, and what the penalties

---

[60] Transcript of Plea Hearing, March 8, 2004, at Page 38.

38

for each entailed. The Petitioner again reiterated his voluntary, intelligent, and knowing intention to plead guilty to the offenses upon direct inquiry of the Court.

In addition, with regard to the claim of incompetence or mental illness impairing the Petitioner's ability to participate or understand the plea hearing proceedings, the record shows the following:

The Court: Now do you have any history of mental illness, alcohol or drug addiction, or any problem like that that affects your ability to understand what you're doing here today?

Petitioner: No, sir.[61]

Of further importance to the Court's inquiry into the effectiveness of counsel in addressing the Petitioner's claims of mental illness and what defenses it may have provided to the Petitioner with respect to the underlying criminal offenses, the plea hearing transcript reveals the following:

The Court: And Mr. Morgan, I know we have had the psychiatric and psychological and found him competent to stand trial. I mean, I know he has got low intelligence, but do you think there is any sort of diminished capacity, or any of those sort of things like that?

Counsel: No, Your Honor, I don't believe there is. *We have discussed the ramifications of that.*[62]

---

[61] *Id.* at Page 36. During the hearing, the Court again revisited the Petitioner's ability to understand the proceedings: when asked if he had consumed any alcohol or drugs or anything else within the prior 48 hours that would affect his ability to understanding what he was doing, the Petitioner replied in the negative.

[62] *Id.* at Pages 36 – 37 (emphasis added).

39

In reference to the claim of ineffectiveness on the part of his attorney, the Petitioner denied any such suggestion:

The Court:     . . . Now Mr. B        , are you satisfied with the manner in which your attorney, Mr. Morgan, has represented you in this case?

Petitioner:     Yes, sir.

The Court:     Do you feel there is anything he failed to do in representing you?

Petitioner:     No, sir.

The Court:     Did he do anything in your case you didn't want him to do?

Petitioner:     Yes, sir.

The Court:     He did something you didn't want him to do?

Petitioner:     No, sir. I mean - - -

The Court:     Do you have any complaints at all about the manner which he has represented you in this case? Do you have any complaints about him representing?

Petitioner:     No, sir.[63]

The Court notes that even before the Petitioner entered his guilty plea on March 8, 2004, he completed a series of plea documents with his attorney, which included a "Defendant's Statement in Support of Guilty Plea." The colloquy between the Court and the Petitioner mirror the questions that are within these documents, which were made a part of the official court file and record during the plea hearing. The Petitioner answered the following questions thusly:

---

[63] *Id.* at Pages 52 – 53.

40

17.	Before your plea of guilty may be accepted, it must appear of record that your plea is freely and voluntarily made with full knowledge of the consequences thereof after being fully advised of your Constitutional Rights pertaining thereto. The questions which follow are being asked in an effort to find out from you whether or not your plea is properly made. You must understand that you are obligated to fully disclose to the Court at this time all the facts and circumstances which bear upon the voluntariness of your plea and if you fail to bring such matters to the attention of the Court at this time, you may not at any time hereafter attack or challenge the validity of your plea of guilty by reason of such matters. Having been so advised, do you know and understand that you are obligated under the law to truthfully and fully answer all questions which are asked of you and to fully disclose to the Court at this time all matters about which the Court inquires? **Yes**.

18.	Have you been treated at any time for mental illness? **Yes**.

19.	Are you under treatment now? **Yes**.

20.	Have you ever been addicted to drugs, that is, "hooked" on drugs? **Alcohol**.

21.	Are you now under the care of any physician for any physical or mental disorder of any kind? **Yes**.

22.	Have you been under the influence of any drugs or alcohol or other stimulants while completing this questionnaire? **No**.

23.	Have you ever taken or consumed any alcohol or any medicine or drug or any kind within the previous twenty-four hours? **No**.

35.	Do you have any evidence or information which you wish to assert to establish that you are not guilty of the offense to which you seek to plead? **No**.

38.	Has anyone made you promises or representations as to how the Judge of this Court will dispose of your case with regard to sentence? **No.**

39.	Do you understand that the Judge alone as guided by law will make the decision as to what sentence he will give with regard to your plea? **Yes**.

41.	Except as shown by your plea bargain, if any, filed in this case, has anyone promised you leniency, a lighter sentence, or probation, or

41

promised not to prosecute you for some other offense or offenses, or offered or paid you money, or offered or given you property, or, by any means whatsoever, induced you, led you, and persuaded or otherwise caused you to plead guilty? **No**.

42. Except as shown by your plea bargain, if any, filed in this case, has anyone threatened you with a denial of probation, or with a more severe sentence, or with prosecution for some other offense or offenses, or with harm or injury to your person or property if you were to plead "not guilty", or in any manner, by any means, coerced you, scared you, forced you, or otherwise caused you to plead guilty? **No**.

With regard to the Petitioner's complaints that his trial counsel was ineffective for pursuing a plea bargain which subjected the Petitioner to a lengthy prison sentence of eighty (80) to one hundred and ninety (190) years, but ultimately resulted in a sentence of not less than twenty-five (25) and no more than fifty-five (55) years despite the Petitioner's age of 43 years old at the time. In short, the Petitioner takes issue that even if he got paroled, at minimum, he would be sixty-eight (68) years of age, however, in all likelihood, he would spend the rest of his life in prison, and this certainly was not in his "best interest" to accept the plea agreement. The Court notes that during the plea hearing, the topic of the lengthy sentence in accordance with the plea was discussed, and of importance to this particular issue, the alternative, being what the Petitioner faced at trial, was addressed as well:

The Court: Of course, I can't begin to count up how many of these there are. But if he is pleading to eight and he has got 30 more, then - - I mean, I assume that they are just multiples - - so then what he would be facing then is probably 500 years to 2000, or something like that. I mean, who knows?

Counsel: I didn't figure those up.

42

The Court:       It's beyond comprehension. Okay? All right.

And again, if I would say, "I'm sorry, you get 90 to 190 years," it's too late for you to say, "I never thought that you would do that. I want to have a trial." Do you understand that?

Petitioner:      Yes, sir.[64]

Indeed, considering a worst-case scenario, had the Petitioner chosen to go to trial on all the counts in the Indictment, and if convicted of all counts, then he would have faced a penalty of no less than four hundred and ten (410) years to no more than nine hundred and thirty (930) years. Even the maximum possible sentence as a result of the plea agreement pales in comparison to the alternative.

The Court recalls that during the disposition hearing held on May 17, 2004, counsel for the Petitioner addressed the Petitioner's low intelligence quotient, and his limited criminal history, and requested that the Court to take the Petitioner's low mental functioning as a mitigating circumstance for purposes of sentencing. However, due to the serious nature of the charges, the Court determined it best to sentence the Petitioner as described herein, as the best possible outcome to protect the children victims:

The Court:       I mean, I just think children need to be protected from him in the meantime. I just don't think he can control himself. I don't believe there is an adequate treatment program that can do anything for him.

. . . I mean, I think if I put him away, basically, for the rest of his life, I don't - - I mean, this is serious and I do

---

[64] *Id.* at Page 12.

recognize his limitations. What I want to do is protect small children from him for the balance of time that I think he can be a harm to them. . . But you know, we just, these little kids have nobody to speak for them and I guess that's my role right here, so I think that's fair to everybody.[65]

A review of the potential maximum sentences available following a conviction at trial or by plea did not present the Petitioner with a Hobson's Choice, as he would want the Court to find, but did present the Petitioner and his counsel with an unenviable dilemma, where the option to take the lesser of the two evils presented made the most sense given the lack of defenses available to the Petitioner at the time. The Petitioner and his counsel advised the Court during the plea hearing that the plea agreement was in the Petitioner's best interest given the circumstances of the case:

The Court: Before I accept your guilty plea, Mr. Morgan, having consulted with your client and investigating this case, having talked to the Prosecuting Attorney's Office and having heard the representations of the State with respect to the evidence and knowing the facts and circumstances surrounding this case, can you see any advantage to your client if this case proceeded to trial?

Mr. Morgan: No, Your Honor, I cannot.

The Court: Do you know of any meritorious defense he would have if the case proceeded to trial?

Mr. Morgan: No, Your Honor.

---

[65] Transcript of Sentencing Hearing, May 17, 2004, at Pages 5 – 7.

44

The Court: Do you feel it's in his best interest for me to accept this plea pursuant to the plea agreement in this case?

Mr. Morgan: Yes, sir, I do.

************

The Court: Now do you want me to accept this plea or let you have a trial? What do you want me to do?

Petitioner: Accept this.[66]

## Findings of Fact and Conclusions of Law

The Court makes the following specific findings of fact and conclusions of law regarding Petitioner's claim of Ineffective Assistance of Counsel: the Court **FINDS** that the Petitioner was fully aware of his intent to plea and pled without raising any issue to his counsel; the Court **FINDS** that the Petitioner's argument regarding the improper handling of his alcoholism and mental illness issues by his trial counsel as being ineffective assistance of counsel is without merit; the Court **FINDS** that the trial court made proper inquiry as to the Petitioner's mental status at the time of the plea, and correctly believed him to be competent to enter this plea; the Court **FINDS** that there was no reasonable basis for the Petitioner's trial counsel to suspect that the Petitioner was not capable of cooperating with him, was incompetent to stand trial or to participate in a plea agreement, or was not criminally responsible for his actions; the Court **FINDS**, given the circumstances of this case, that the plea agreement eventually accepted by the Petitioner and the sentences he received as a result therefrom was in the Petitioner's best interest as opposed to taking the case to trial; the Court **FINDS**, given the circumstances of this case, the Petitioner's trial counsel's performance was not deficient under an objective

---

[66] Transcript of Plea Hearing, March 8, 2004, at Pages 52 and 54.

standard of reasonableness; finally, the Court **FINDS** that, even if trial counsel made unprofessional errors (which the record reveals that he did not), the result would not have been different.

Accordingly, the Court **FINDS** and **CONCLUDES** that the Petitioner has failed to prove that his trial counsel was ineffective by a preponderance of the evidence and that the Petitioner's claim that he received ineffective assistance of counsel is without merit.

## 2. Was the Petitioner's guilty plea involuntary?

The West Virginia Supreme Court of Appeals has held that "[a] direct appeal from a criminal conviction based on a guilty plea will lie where an issue is raised as to the voluntariness of the guilty plea or the legality of the sentence." Syl. Pt. 1, *State v. Sims*, 162 W.Va. 212, 248 S.E.2d 834 (1978). The *Sims* Court further provides: "the controlling test as to the voluntariness of a guilty plea, when it is attacked either on a direct appeal or in a habeas corpus proceeding on grounds that fall within those on which counsel might reasonably be expected to advise, is the competency of the advice given by counsel. *Id.*, at Syl. Pt. 2. Finally, in Syllabus Point 3, the *Sims* Court gives the following criteria for circuit courts to explore when facing the question as to whether a plea is voluntary:

> Before a guilty plea will be set aside based on the fact that the defendant was incompetently advised, it must shown that (1) counsel did act incompetently; (2) the incompetency must relate to a matter which would have substantially affected the fact-finding process if the case had proceeded to trial; (3) the guilty plea must have been motivated by this error.

Again, from the Petitioner's "Defendant's Statement in Support of Guilty Plea" that was filed contemporaneously with his petition to enter a guilty plea, the Petitioner answered the following questions:

43. · Do you plead guilty of your own free will? **Yes**.

46

44.    Do you believe yourself to be guilty? **Yes**.

70.    Do you know and understand that your decision to plead guilty is final and that your plea may not be withdrawn for any reason after it is accepted? **Yes**.

71.    Have you truthfully and fully answered all of these questions? **Yes**.

At the close of the plea hearing proceedings, after the lengthy colloquy between the Court and the Petitioner, much of which is reproduced *infra*, the Court properly found that the Petitioner voluntarily entered his guilty pleas:

The Court further finds that the Defendant has knowingly and intelligently waived or given up all of his constitutional rights freely, voluntarily, intelligently, knowingly, understandingly tendered to this Court both his written and oral plea of guilty to the three counts of sexual assault in the first degree, three counts of incest and two counts of sexual abuse by a custodian, provable crimes as contained in the indictment in this case, that there is a factual basis for the guilty plea and that the plea agreement is consistent with the fair administration of justice.

Therefore, this Court is of the opinion to, and does, hereby accept the Defendant's pleas of guilty tendered to the Court. Upon said pleas this Court does adjudge the Defendant, Larry B      .,

guilty of three counts of sexual assault in the first degree, three counts of incest and two counts of sexual abuse by a custodian.[67]

---

[67] *Id.* at Pages 56 – 57.

47

**Findings of Fact and Conclusions of Law**

The Court **FINDS** and concludes that the Petitioner has failed to produce any evidence sufficient to prove by a preponderance of the evidence that his plea was not knowingly, involuntarily, and intelligently made. The Court **FINDS** and **CONCLUDES** that the Petitioner's claim that his guilty plea was involuntarily given is without merit.

## 3. Did the Petitioner receive a disproportionate sentence?

According to the West Virginia Supreme Court of Appeals, "[b]oth the United States Constitution and the West Virginia Constitution prohibit sentences which are disproportionate to the crimes committed." *E.g., State v. Richardson*, 214 W.Va. 410, 413, 589 S.E.2d 552, 555 (2003). The Supreme Court of Appeals has established a two stage analysis for determining if a sentence is disproportionate. First, the subjective test is analyzed: "[p]unishment may be constitutionally impermissible...if it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends the fundamental notions of human dignity..." *State v. Cooper*, 172 W.Va. 266, 304 S.E.2d 851 (1983) at Syl. Pt. 5. If the sentence does not shock the conscience of the court, then the second objective test is evaluated. In that test, numerous factors are examined to determine if the sentence is disproportionate. Factors to be considered include the age of the defendant, prior record of the defendant, rehabilitative potential (including post arrest, age, and maturity), statements of the victim, evaluations made in anticipation of sentencing, and remorse of the defendant. *Id.* At 271-272, 856; *see also State v. Booth*, 224 W.Va. 307, 314, 685 S.E.2d 701, 708 (2009). Additional guidelines for the objective test were set out in Syllabus Point 5 of *Wanstreet v. Bordenkircher*, 166 W.Va. 523, 276 S.E.2d 205 (1981), as follows:

48

> In determining whether a given sentence violates the proportionality principle found in Article III, Section 5 of the West Virginia Constitution, consideration is given to the nature of the offense, the legislative purpose behind the punishment, a comparison of the punishment with what would be inflicted in other jurisdictions, and a comparison with other offenses within the same jurisdiction.

Sentences within legal guidelines can transgress the proportionality principles. *E.g., State v. David*, 214 W.Va. 167, 177, 588 S.E.2d 156, 166 (2003), *State v. Richardson*, 214 W.Va. 410, 413, 589 S.E.2d 552, 555 (2003), *c.f. State v. Slater*, 222 W.Va. 499, 665 S.E.2d 674 (2008). Disproportionate sentence issues are appropriate for a habeas corpus petition. *E.g., State ex rel. Hatcher v. McBride*, 221 W.Va. 760, 656 S.E.2d 789 (2007).

With regard to the Petitioner's claim of severer sentence than expected, excessive sentence, consecutive sentences for same transaction, or disproportionate sentence, the transcript from the plea hearing dispels any notions that the Petitioner was somehow led astray by his counsel or by the Court:

The Court: And you understand now that I didn't participate in this plea agreement process resulting in this agreement. There is no agreement as to punishment or probation. That's a decision I alone make. Do you understand that?

Petitioner: Yes, sir.

The Court: So if I say, and I'll just add these up, because 15 to 35 times 3 would be 45 to 105; and five to 15 on 3 incest would be 15 to 45 more . . . [Y]ou could face a minimum of 90 years in jail before you could be eligible for parole. Do you understand that?

Petitioner: Yes, sir.

The Court: A minimum of 90 years. You could face that. And a maximum of – 105 plus 45 is 150, plus 40 is 190 – anywhere from 90 to 190 years in the penitentiary you could get. Do you understand that?

Petitioner: Yes, sir.

The Court: I mean, you could get 90 years before you see the light of day. Do you understand that, too?

Petitioner: Yes, sir.

The Court: How old are you now?

Petitioner: I'm 40 – I'll be 44 on the 17th of this month.

The Court: Well I guess what I am trying to say is this. I just saw on television where the person they think is the oldest man in the world just died, and he was 114 years old. Okay? So if I gave you 90 years in the penitentiary – the minimum – you would have to outlive that guy by twenty years before you would be eligible for parole. Do you understand that?

Petitioner: Yes, sir.

The Court: I'm not saying I'm going to do that, but I could. Do you understand that?

Petitioner: Yes, sir.

The Court: And I don't know of anybody since Methuselah that's lived 190 plus. . . I mean, *you could, basically, just spend the rest of your life in jail.* Do you understand that?

50

Petitioner:     Yes, sir.[68]

\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The Court:     Well, Mr. B.     , this is really important, because like if

you get, if I accept these pleas and I give you a bunch of

time in jail and 20 years from now you just decide, you

know, I want to get out of here because I gave them a

statement. They tricked it out of me. They beat it out of me.

Or they found something they shouldn't have done or they

let them do something they shouldn't do. Well it would be

too late for you to come back in here and say, "I want a

trial. I shouldn't have done that. That wasn't right." Do you

understand that?

Petitioner:     Yes, sir.[69]

The Petitioner's "Defendant's Statement in Support of Guilty Plea" also outlines

the plea, the penalties therefore and his willingness to plead guilty to the charges. The

plea agreement, written on "Prosecuting Attorney of Mercer County" stationary, also

outlines the offenses to which the Petitioner agreed to plead guilty and the respective

penalties.

During the sentencing hearing, neither the Petitioner nor his counsel had any

corrections or additions to make to the pre-sentence investigation report.[70] That report

addressed, among several other aspects of the Petitioner's background, the Petitioner's

criminal history, which did not include any felony convictions, and only relatively minor

---

[68] *Id.* at Pages 10 – 12 (emphasis added).

[69] *Id.* at Page 34.

[70] Transcript of Sentencing Hearing, May 17, 2004, at Page 3.

51

offenses as opposed to the matters herein, the gravest of which included a pair of convictions for Driving Under the Influence. However, the Court notes that the "Official Sentiment" of the underlying criminal case, by the investigating officer, Sgt. M. L. Gills of the Mercer County Sheriff's Department, advised that the Petitioner "has a history of this sort of criminal behavior. At one time he was investigated for running an escort service out of his mother's residence. He was also investigated on similar sexual abuse offense [sic] in McDowell County." The pre-sentence investigation report also included the lengthy transcriptions of the interviews taken of the Petitioner and two of the minor victims by Child Protective Services Worker, Cynthia Snuffer of the Department of Health and Human Resources. The Court recalled that the allegations contained in those pages were graphic.

**Findings of Fact and Conclusions of Law:**

The Court **FINDS** that the Petitioner's sentence was within statutory limits and was not based on impermissible factors. *State v. Goodnight*, 169 W.Va. 366, 287 S.E.2d 504 (W.Va. 1981) at Syl. pt. 4, *State v Sugg*, 193 W.Va. 388, 456 S.E.2d 469 (1995). The Court **FINDS** that the Petitioner's sentences that are within the statutory limits are not entitled for statutory review. *State v. Koon*, 190 W.Va. 632, 440 S.E.2d 442 (1993). The Court **FINDS** that, while constitutional proportionality standards theoretically can apply to any criminal sentence, they are basically applicable to those sentences where there is either no fixed maximum set by or where there is a life recidivist statute. *Wanstreet v. Bordenkircher*, 166 W.Va. 523, 276 S.E.2d 205 (1981), at Syl. pt. 4. The sentences in this action are not of either type.

52

Despite the Petitioner's arguments that his sentence was "long" and "too harsh" and that it was unexpected, the criminal record shows that there is simply no basis in fact or constitutional support for these arguments. Accordingly, the Court **FINDS** that the Petitioner failed to prove by a preponderance of the evidence that he received a disproportionate sentence. The Court **FINDS** and **CONCLUDES** that the Petitioner's claim that he received a disproportionate sentence is without merit.

### 4. Were the Petitioner's Federal and State Constitutional rights violated by an inadequate indictment?

The Petitioner has complained that the basis for the plea agreement was inadequate protection against double jeopardy, as the details were lacking to support the offenses to which he entered his guilty pleas. However, the evidence solicited during the omnibus hearing provided very little to the Court in order to resolve this narrow question.

Despite the testimonial evidence concerning the Petitioner's claim for inadequate indictment, the criminal record below indicates that neither the Petitioner nor his counsel harbored any such concerns; indeed, the Court reviewed the offenses in the Indictment, the burden of the State to prove same, as well as the elements comprising the offenses with the Petitioner during the plea hearing *ad nauseum*. Further, the Court warned the Petitioner that when a plea is accepted, there is no turning back, even if the sentence is unexpectedly greater, particularly when the Court does not participate in the plea negotiations process.

Moreover, no factual basis was provided to the Court for this argument during the omnibus hearing, save for a simple denial by the Petitioner's trial counsel that there were any defects in the indictment that he was aware of, and the Petitioner's opinion that the indictment lacked specifics.

53

**Findings of Fact and Conclusions of Law:**

The Court **FINDS** and **CONCLUDES** that because none of the allegations of errors asserted above constitute grounds to grant the Petition, the claim of inadequate indictment is without merit.

**5. Were the Petitioner's Federal and State Constitutional rights violated pursuant to the additional grounds raised in his *Losh* Checklist?**

Regarding the Petitioner's claim of prejudicial pretrial publicity, the evidence taken during the omnibus hearing provided no additional factual details that would carry the burden of proof on this claim. During the omnibus hearing, the Petitioner's testimony did little to enlighten the Court on this claim, as he could not remember if his case was featured in the newspapers at the time. Further, the Petitioner's trial counsel testified that he did not recall any pretrial publicity that caused him any concern.

Nevertheless, despite the Petitioner's assertions during the omnibus evidentiary hearing, the record from the underlying criminal proceeding reveals no such issues of pretrial publicity, and again, during the plea hearing and the sentencing hearing that followed, the Petitioner neither indicated to his counsel, nor to the Court that he had been prejudiced by any pretrial publicity.

With regard to the Petitioner's claim that his trial counsel failed to take an appeal, the Court mentioned *infra* that the official court file indicated that none was taken following the criminal proceeding, ostensibly due to the legal strategy with respect to this civil action. Matters of trial or legal strategy are improper grounds for habeas relief.[71] Moreover, the only evidence elicited during the omnibus hearing was that the Petitioner

---

[71] See, e.g., Syl. Pt. 4, *State ex rel. Postelwaite v. Bechtold*, 158 W. Va. 479 (1975).

54

did not approach his trial counsel about an appeal although the Petitioner himself would have "liked to seen" an appeal filed because of the sentence he received.

The underlying criminal record disputes the Petitioner's claim that he was mentally incompetent at the time of the crime; again, as described *infra*, the Petitioner's trial counsel had the Petitioner evaluated prior to the plea hearing, and the Court found that the Petitioner was criminally responsible for the offenses herein. At no time subsequent to the Court's Order regarding the competency evaluation did the Petitioner dispute or offer further explanation or opinion evidence to contest the Court's ultimate finding of the Petitioner's competency and criminal liability. The testimonial evidence taken during the omnibus hearing did nothing to persuade this Court that the Petitioner's mental competency at the time of the offense or at the time of the plea hearing prevented him from entering his plea of guilty voluntarily or knowingly.

Moreover, the claim that the Petitioner received mistaken advice of counsel as to parole or probation eligibility is also disputed in the record, and the Petitioner was warned and advised repeatedly by the Court of the consequences of the plea and further reminded the Petitioner about his realistic chances of parole eligibility and the probability that he would spend the remainder of his life incarcerated.[72] During the omnibus hearing, there was simply no evidence submitted to dispute the record below or to further the Petitioner's claim of mistaken advice of counsel as to parole or probation eligibility.

The Petitioner's claim as to insufficient evidence to sustain his guilty plea is likewise without merit, as the following exchange during the plea hearing on March 8, 2004 illustrated what the evidence would have been should the case have proceeded to trial:

---

[72] See the extracts of the Plea Hearing Transcript detailed, *supra*.

55

Mr. Boggess: Your Honor, the State's evidence would show that there were three victims in this matter; one being the Defendant's brother, one being his son and one being his stepdaughter.

The Court: How old was the brother?

Mr. Boggess: At the time this happened he was under 11 and 12, Your Honor.

The Court: Okay, go ahead.

Mr. Boggess: That happened back in, the exact date is not known. But with respect to his brother, the evidence shows that the Defendant had the brother perform oral sex on him and he also performed oral sex on his brother. This occurred back around 1990, 1991. The way that they traced that date back was he couldn't remember the exact time it happened, but could remember what kind of car he had at the time. And they tracked it back through the cars at that time to what he had at the timeframe it occurred. He admitted this to one of the workers from the DHHR.

With respect to his son and his stepdaughter, the evidence would again show the years 2002, 2003 at numerous times. Again, it was hard to pinpoint the times due to the children's ages as well as the children's mental capacity. He had children performing oral sex on him.

56

The daughter described how he would expose himself and tell his daughter that he wanted her to treat his penis like a lollipop, and that they would perform oral sex on him. And at one point he actually, the daughter said that he actually penetrated her, but she cried. He told her that he would kill her if she did not quit crying. What this little girl related to her teacher at school and to the social worker, this continued for a period of years, and finally, it was ultimately discovered and looked into and investigated.

And again, Mr. B          has admitted to these acts.

The Court:      All right. Mr. B          —

Mr. Morgan:    He did not admit, he did not give a statement regarding the last alleged. He gave a general denial. He denied that.

The Court:      But the other he admitted?

Mr. Boggess:   Yes, Your Honor.

The Court:      All right. Now Mr. B          you heard what the Prosecutor said the State's evidence would be if this went to trial. Is that what happened here?

Petitioner:     Yes, sir.

The Court:      Did you, I mean, you had sex with these three people?

Petitioner:     Yes, sir.

The Court:      Okay. And they were under the age of 11 when you did it and you were more than 14?

57

Petitioner:    Yes, sir.

The Court:    Okay. And you know what I mean by "having sex"? In other words, there was oral sex here. Do you understand that?

Petitioner:    Yes, sir.

The Court:    So you are entering this plea of guilty because you are, in fact, guilty then. Is that right?

Petitioner:    Yes, sir.

Despite the Petitioner's current claims of innocence with regard to the misconduct to which he previously pled guilty, the record is clear that the Petitioner did more than simply teach his nephew how to masturbate.

**Findings of Fact and Conclusions of Law:**

Based on the aforementioned, the Court **FINDS** that there was sufficient evidence upon which the Petitioner's guilty plea of guilty could be substantiated. The Court **FINDS** and **CONCLUDES** that the Petitioner's assertion that there was not sufficient evidence to sustain his conviction is without merit.

The Court **FINDS** that the Petitioner has failed to prove by a preponderance of the evidence that his mental competency at either the time of the crime or offense, including at the time of his plea, is a ground for relief. The Court **FINDS** and **CONCLUDES** that the Petitioner's issue of mental competency is without merit.

The Court **FINDS** that the Petitioner has failed to prove by a preponderance of the evidence that he received mistaken advice of counsel as to parole or probation eligibility

58

is a ground for relief. The Court **FINDS** and **CONCLUDES** that the Petitioner's issue of mistaken advice of counsel as to parole or probation eligibility is without merit.

The Court **FINDS** that the Petitioner failed to prove by a preponderance of the evidence that his trial counsel failed to take an appeal that would entitle him to relief. The Court **FINDS** and **CONCLUDES** that the Petitioner's claim that his trial counsel failed to take an appeal is without merit.

## RULING

WHEREFORE, for the reasons set forth in the foregoing opinion, the Court **ORDERS and ADJUDGES** as follows:

1. That the Petition for Writ of Habeas Corpus sought by the Petitioner is hereby **DENIED** and this action is ordered **REMOVED** from the docket of this Court.

2. The Court appoints Paul Cassell, Esq., to represent the Petitioner on any appeal of this ruling.

3. This is a final order. The Circuit Clerk is directed to distribute a certified copy of this Order to Paul Cassell, Esq., at 340 West Monroe Street, Wytheville, VA 24382; to John McGinnis, IV, Esq., Assistant Prosecuting Attorney of Mercer County, West Virginia at 120 Scott Street, Suite 200, Princeton, WV 24740, and to the Petitioner at Mount Olive Correctional Complex, at 1 Mountainside Way, Mount Olive, WV 25185.

**ENTER:** This the 22nd day of June, 2016.

DEREK C. SWOPE, JUDGE
9th Judicial Circuit

59